IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

|  |  |
|---|---|
| RAVEN TORRES-TORRES,<br><br>Plaintiff,<br><br>v.<br><br>ROBERTO REVOL MARTÍNEZ-LEBRON, UPDATE MUSIC CORP., et al.,<br><br>Defendants. | **Civil No. 25-1082 (GMM)** |

OPINION AND ORDER

This is a diversity jurisdiction suit filed by Plaintiff Raven Torres-Torres ("Torres" or "Plaintiff") against Defendants Roberto Revol Martínez-Lebron ("Martínez") and Update Music Corp. ("Update Music") (collectively, "Defendants") seeking the nullification of a contract and the recovery of damages for defamation, infringement of moral rights, unjust enrichment, and tortious interference. (Docket No. 1). Pending before the Court is Plaintiff's *Motion to Dismiss Counterclaim* ("*Motion to Dismiss*"). (Docket No. 41).

For the reasons discussed below, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiff's *Motion to Dismiss*.

I.    RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

Torres is a songwriter who, in September of 2018 entered into publishing, management, and recording contracts with Martínez under the latter's company Update Music. (Docket No. 1 at 3 ¶ 11). Torres avers that he experienced difficulties dealing with

Civil No. 25-1082 (GMM)
Page -2-

Martínez from the start - such as receiving threats, witnessing erratic behavior, and being the subject of unreasonable requests. (Id. at 3-4 ¶¶ 12-13). Due to the allegedly ongoing conduct, in January of 2019, Torres requested the termination of the contracts and to be released from his obligations. (Id. at 4 ¶ 14). On June 4, 2019, Torres received an email from Martínez releasing him from his contracts with Update Music. (Id. at 5 ¶ 19).

On June 12, 2020, Torres signed an exclusive management, representation, and editorial contract with Juan Carlos Monserrate ("Monserrate") and Edwin Prado-Galarza ("Prado"). (Id. at 5 ¶ 20). A few weeks later, Martínez contacted Torres to request the composition of four songs for $4,000. (Id. at 5 ¶ 22). According to Torres, this is evidence that he did not have a contractual relationship with Martínez. (Id.). Subsequently, in either February or March of 2021, Martínez contacted Torres requesting a composition for the artist Ozuna, which Plaintiff provided. (Id. at 5 ¶ 23). However, Torres notified Martínez that he had signed an exclusive contract with Monserrate and Prado, to which Martínez allegedly reacted surprised and claimed that their 2018 contracts were still in effect. (Id. at 5-6 ¶ 24). Allegedly, attempts by Torres to contact Prado to clarify Martínez's claims were unsuccessful. Furthermore, Torres visited Prado's office and was told by security personnel that he was not welcomed there. (Id. at 6 ¶ 25). Torres alleges that, due to the lack of communication, he

Civil No. 25-1082 (GMM)
Page -3-

assumed that Monserrate and Prado had put an end to their agreement. (Id. at 6 ¶ 26). As a result, Plaintiff claims that said contract was never executed. (Id. at 6 ¶ 27).

On April 26, 2021, Torres purportedly received a threatening call from Martínez, who sent a document titled in Spanish "Adendum para Acuerdo y Compromiso de Contrato Excistente [sic]." (Id. at 6 ¶ 28). Torres signed this agreement without prior attorney review. Nevertheless, Torres claims that he did so out of fear, and due to Martínez' threats. (Id. at 6 ¶ 29).

The Complaint alleges that, thereafter, Torres felt compelled to perform under this contract - and did so - by writing fifteen songs for Update Music. (Id. at 7 ¶ 31). Despite this, Martínez continued to threaten Torres. (Id. at 8 ¶¶ 33-34). Among these threats, Torres feared that Martínez would damage Plaintiff's reputation in the music industry. (Id. at 8 ¶ 34). Moreover, Plaintiff posits that Martínez interfered with Torres' ability to obtain a publishing deal on his own. (Id. at 8-9 ¶ 36).

Notwithstanding the alleged interference, at the beginning of 2022, there were discussions led by Martínez about a potential publishing deal with Torres and PeerMusic III, Ltd. ("PeerMusic"), but Torres was excluded from the discussions. (Id. at 9 ¶ 37). A PeerMusic contract was formally delivered in August of 2022; Martínez demanded that Torres sign it immediately and stated that no one in the industry would work with him if he failed to sign.

Civil No. 25-1082 (GMM)
Page -4-

(Id. at 9 ¶ 39). The *Complaint* further avers that Torres delivered over 150 compositions to Update Music in compliance with his obligations under the PeerMusic agreement but received only $60,000 out of the $200,000 that he was owed. (Id. at 9-10 ¶¶ 41-45). According to the *Complaint*, Martínez failed to use these compositions. (Id. at 10 ¶ 45). After more than six months with no word on the status of the compositions, Torres reached out to Martínez. (Id. at 10 ¶ 46). The latter replied that he did not have time to listen to Torres. (Id.).

Consequently, Torres requested that Martínez release him from his obligations and settle matters amicably. (Id. at 10-11 ¶ 47). Martínez allegedly responded with insults and additional threats of closing the doors for Plaintiff in the music industry. (Id.). Apparently, Martínez also said that he would give Torres the release in exchange for $75,000. (Id.). At this point, Torres consulted with an attorney and, through counsel, sent a communication to Martínez asserting that their agreement was null and void. (Id. at 11 ¶¶ 49-50). This communication was dismissed by Martínez who, in turn, threatened legal actions against Torres. (Id. at 11-12 ¶ 52). Torres allegedly refrained from taking any actions to a avoid conflict that could effectively halt his career. (Id. at 12 ¶ 53). It is further alleged that Martínez took deliberate steps to prevent Torres from working with others; Martínez sabotaged Torres' career in the music industry; and made

Civil No. 25-1082 (GMM)
Page -5-

defamatory statements about Torres. (Id. at 12-13 ¶¶ 54-56, 14 ¶ 62).

In addition, Torres alleges that on January 20, 2025, Martínez sent Plaintiff a voice note via Instagram reminding him of the existent commitment with the editorial company, referring to PeerMusic, which was tied to the advance payment. (Id. at 13-14 ¶ 59). Supposedly, Martínez told Torres that Martínez personally acted as a guarantor and co-debtor for Torres' catalog because Torres lacked sufficient assets to secure the advance independently. Torres avers that Martínez demanded - for a second time - that Torres pay to secure a release from the agreement, allegedly reflecting continued effort to exert financial and professional control over Plaintiff. (Id.).

As a result, on February 10, 2025, Torres filed the instant Complaint with six causes of action under Puerto Rico Law. First, Torres requests that the documents titled "Adendum para Acuerdo y Compromiso de Contrato Excistente [sic]" be declared null and void because they were signed under coercion and intimidation. (Id. at 15-17 ¶¶ 65-80). Second, Torres requests he be awarded monetary damages as a result of the negligent, bad faith and/or unlawful acts by the Defendants. (Id. at 17-21 ¶¶ 81-99). Within that cause of action, Torres also claims damages for defamation by Defendants. (Id.). Third, Torres claims damages for Defendants' violations of the Puerto Rico Moral Rights Act, Act. No. 55-2012. (Id. at 21-22

Civil No. 25-1082 (GMM)
Page -6-

¶¶ 100-08). Fourth, Torres pleads unjust enrichment in the alternative. (Id. at 22-24 ¶¶ 109-17). Fifth, Torres claims tortious interference under Article 1536 of the Puerto Rico Civil Code. (Id. at 24-26 ¶¶ 118-26). Sixth, Torres requests attorney's fees. (Id. at 26 ¶¶ 127-28).

In response, on August 11, 2025, the *Defendant's Answer to Complaint and Counterclaim* ("*Counterclaim*") was filed alleging tortious interference, breach of contract, defamation, and unjust enrichment, in the alternative, against Torres. (Docket No. 40). Defendants counterclaim that "[i]n or around the first quarter of 2025, [Torres], who had signed an exclusive artist agreement with Update Music [] in 2018, was aware that, around the same time as his own signing, [Update Music] had also entered into an exclusive production and producer/artist management agreement with producer 'Bless The Producer.'" (Id. at 11). During that period, Defendants allege that Torres contacted producers under contract with Martínez and made statements of a defamatory nature regarding Update Music and Martínez, such as that Martínez failed to promote or advance his artists' careers. (Id. at 11-12).

Further, Defendants counterclaim that, at the time that Torres committed these acts, they were actively making arrangements for Torres to record with internationally recognized artists such as Anuel, Ozuna, Lunay, and Yandel, and had secured publishing and administration agreements with PeerMusic for the

Civil No. 25-1082 (GMM)
Page -7-

benefit of Torres' compositions. (Id.) In addition to the defamation claims, Defendants aver that Torres breached his agreement with Update Music by: releasing an EP without Martínez's prior authorization; failing to provide all necessary publishing information to Martínez to allow for the commercialization of compositions under the PeerMusic agreement; and, as of on or about February 13, 2025, ceasing to deliver new songs as required under the contract. (Id. at 13).

On September 2, 2025, Plaintiff filed his *Motion to Dismiss* pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6). (Docket No. 41). According to Torres, Defendants' tortious interference and defamation are permissive counterclaims which the Court lacks supplemental or diversity jurisdiction over because they are based on separate events, contracts, and alleged statements occurring in 2025 that are unrelated to the central dispute over the June 2019 release and the April 2021 "Addendum" raised in the *Complaint*. (Id. at 3). He adds that Defendants have not alleged complete diversity of citizenship or pled any facts demonstrating that these claims meet the $75,000 jurisdictional threshold required by 28 U.S.C. § 1332. (Id. at 5).

In addition, Plaintiff posits that Defendants' *Counterclaim* should be dismissed for failing to state a claim. Plaintiff asserts that Defendants fail to plead a plausible claim for tortious interference under Puerto Rico law. (Id. at 7-9). As to the breach

of contract claim, Plaintiff argues that the *Counterclaim* merely recites statutory provisions on contractual obligations and that no copy of the alleged contract is attached. (Id. at 10). Regarding the defamation claims, Plaintiff asserts that Defendants also fail as they simply recite elements of the cause of action with broad and conclusory statements. (Id. at 11). Finally, as to the unjust enrichment claim, Plaintiff argues that since Defendants rely on the alleged "exclusive agreement," this claim is barred as a matter of law. (Id. at 12).

On September 16, 2025, *Defendants' Opposition to Plaintiff's Motion to Dismiss Counterclaim* was filed. (Docket No. 42). Defendants argue that the Court has subject matter jurisdiction over the counterclaims because under Rule 13(a)(1)(A) and First Circuit caselaw these counterclaims are compulsory and arise from the same nucleus of operative facts. (Id. at 2-8). Notwithstanding, Defendants argue that the *Counterclaim* is supported by well-pled factual allegations and are more than sufficient to meet the pleading standards. (Id. at 6-8).

## II.   LEGAL STANDARD

Several legal standards guide the Court's analysis of the motions before it.

### A.   Fed. R. Civ. P. 12(b)(1)

Federal courts are of limited jurisdiction, and on a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1),

Civil No. 25-1082 (GMM)
Page -9-

the Court must ensure it has the constitutional and statutory authority to adjudicate. *See* Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994). The party asserting federal jurisdiction is responsible for establishing that such jurisdiction exists. Spielman v. Genzyme Corp., 251 F.3d 1, 4 (1st Cir. 2001). The Court "must resolve questions pertaining to its subject-matter jurisdiction before it may address the merits of a case." Donahue v. City of Boston, 304 F.3d 110, 117 (1st Cir. 2002).

Review for dismissal for lack of subject matter jurisdiction under Rule 12(b)(1) is "similar to that accorded a dismissal for failure to state a claim pursuant to" Rule 12(b)(6). Murphy v. United States, 45 F.3d 520, 522 (1st Cir. 1995). That is, "[w]hen a district court considers a Rule 12(b)(1) motion, it must credit the [non-movant's] well-pled factual allegations and draw all reasonable inferences in the [non-movant's] favor." Merlonghi v. United States, 620 F.3d 50, 54 (1st Cir. 2010). The court's subject matter jurisdiction "must be apparent from the face of the [] pleading," and cannot rest "merely on unsupported conclusions or interpretations of law." Johansen v. United States, 506 F.3d 65, 68 (1st Cir. 2007) (citation modified).

B.    Fed. R. Civ. P. 12(b)(6)

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the pleadings,

Civil No. 25-1082 (GMM)
Page -10-

rather than the merits of the claim. *See* Twum-Baah v. Dep't of Agric., 299 F. Supp. 3d 369, 372 (D.P.R. 2018).

Under Rule 12(b)(6), a pleading can be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When evaluating a motion under this rule, a court "must accept as true the well-pleaded facts of the complaint while simultaneously drawing all reasonable inferences in [non-movant's] favor." LaChapelle v. Berkshire Life Ins., 142 F.3d 507, 508 (1st Cir. 1998). After doing so, the Court must determine if the allegations are sufficient to "raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.

To survive a motion to dismiss, a claim must be plausible on its face. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A plaintiff, or here a counterclaimant, can meet this standard when it "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Plausible "means something more than merely possible." Zenon v. Guzman, 924 F.3d 611, 616 (1st Cir. 2019) (internal citations omitted). Gauging plausibility "is a 'context-specific' job that compels [the Court] 'to draw on' [its] 'judicial experience and common sense.'" Id. (*quoting* Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012)).

Civil No. 25-1082 (GMM)
Page -11-

While engaging in this analysis, a court "may augment the[] facts and inferences [from the complaint] with points gleaned from documents incorporated by reference into the countercomplaint, matters of public record, and facts susceptible to judicial notice." Starr Surplus Lines Ins. Co. v. Mountaire Farms Inc., 920 F.3d 111, 114 (1st Cir. 2019) (*quoting* Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011)). In fact, when a complaint's factual allegations are "expressly linked to – and admittedly dependent upon – a document [offered by the movant] (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it." Beddall v. State St. Bank & Tr. Co., 137 F.3d 12, 17 (1st Cir. 1998) (citations omitted). Accordingly, federal courts have discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it. 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1366 (3d ed. 1998).

### III.    APPLICABLE LAW AND DISCUSSION

A.    Supplemental Jurisdiction

Plaintiff argues that this Court lacks supplemental jurisdiction over the Puerto Rico law tortious interference and defamation counterclaims. He states that these are permissive

Civil No. 25-1082 (GMM)
Page -12-

claims because they are based on separate events, contracts, and alleged statements from 2025 that are unrelated to the central dispute of his *Complaint*. Torres further argues that these counterclaims involve different facts, witnesses, and evidence, and a judgment on Plaintiff's claims would not bar later litigation on these allegations. *See generally* (Docket No. 41). The Court, however, disagrees.

Under 28 U.S.C. § 1367(a), supplemental jurisdiction extends over any claims "so related to claims [the court has original jurisdiction over] that they form part of the same case or controversy." Courts may decline to exercise supplemental jurisdiction over certain claims, referred to as permissive counterclaims. *See* 28 U.S.C. § 1367(c). Although such permissive counterclaims previously required an "independent basis for jurisdiction" in the First Circuit, following the enactment of 28 U.S.C. § 1367, the appellate court no longer requires different bases for jurisdiction between compulsory and permissive counterclaims. *See* Glob. NAPS, Inc. v. Verizon New England Inc., 603 F.3d 71, 76 (1st Cir. 2010). Instead, for both categories, courts look to whether the claims in question share "a common nucleus of operative fact," and if a party would "ordinarily be expected to try them all in one judicial proceeding." Envisn, Inc. v. Davis, No. 11-CV-12246-FDS, 2012 WL 1672887, at *2-3 (D. Mass.

**Civil No. 25-1082 (GMM)**
**Page -13-**

May 11, 2012) (*quoting* <u>United Mine Workers of Am. v. Gibbs</u>, 383 U.S. 715, 725 (1966)).

Here, Plaintiff's claims, as alleged in his *Complaint*, mainly revolve around an agreement between him and Update Music which was signed in 2018. The acts allegedly committed by Defendants span from 2018 to January 2025. In turn, the *Counterclaim*, brings claims that arise out of Plaintiff's acts that allegedly occurred in the first quarter of 2025, time at which Defendants allege he was aware of another agreement entered into by Update Music, because of the agreement he signed in 2018.[1]

Thus, Defendants' counterclaims regarding breach of contract, defamation, and tortious interference, warrant supplemental jurisdiction because resolution of those claims will require examination of substantially overlapping facts concerning the parties' contractual relationship, their performance under the alleged agreements, their communications with third parties in the music industry, and the continuing validity and scope of the obligations allegedly originating from the 2018 agreement. *See generally* (Docket No. 40). As such, the relevant issues of fact and of law overlap, as both the *Complaint* and the *Counterclaim*

---

[1] Notably, in the *Complaint* Torres alleges that on January 20, 2025, Martínez sent him a voice note via Instagram reminding the Plaintiff of the existent commitment with the editorial company, referring to PeerMusic, and allegedly warned him that he was still bound by the terms of the agreement subscribed in 2018.

Civil No. 25-1082 (GMM)
Page -14-

turn on the parties' rights and obligations under the same artist agreement, addendum, and related music industry business.

Moreover, the evidence, discovery, and testimony necessary to prove these claims are sufficiently related such that they constitute a common nucleus of operative fact. *See* Pueblo Int'l, Inc. v. De Cardona, 725 F.2d 823, 826 (1st Cir. 1984). It is likely that to resolve each side's claims, the parties will necessarily need to produce the same agreements, invoices, communications, and other documentation. Further, whether the agreement in question is lawful – which is central to the *Complaint* - would ultimately influence the disposition of the merits and the calculation of any damages to be potentially awarded in resolving the *Counterclaim*. Thus, taking these considerations together, the Court finds that the *Counterclaim* is so related to the original claim that they consist of the same case or controversy.[2]

On top of this, retaining the *Counterclaim* promotes efficiency. The exercise of supplemental jurisdiction is to ensure "judicial economy, convenience, and fairness to litigants." *See*

---

[2] The Court will not weigh in on whether these counterclaims are compulsory or permissive. The First Circuit no longer distinguishes between compulsory and permissive counterclaims when evaluating whether to confer supplemental jurisdiction; rather, the accurate inquiry is whether the claims arose from a common nucleus of operative facts. Glob. NAPs, Inc., 603 F.3d at 87-88 ("[Section] 1367 supersedes case law on supplemental jurisdiction that had distinguished between compulsory and permissive counterclaims."). As such, it is not necessary for this Court to decide whether the counterclaim is compulsory or permissive in nature, because the Court's finding that the Counterclaim shares a common nucleus of operative fact with the Complaint is sufficient to confer supplemental jurisdiction.

Civil No. 25-1082 (GMM)
Page -15-

Gibbs, 383 U.S. at 726. Given that the present action has been ongoing for nearly two years, severance of the *Counterclaim* and a remand to state court would upend the aforementioned purposes. To the contrary, this would prolong litigation, further delay resolution of the dispute, and create opportunities for inconsistent application of law. Having found that the Court has subject matter jurisdiction over the *Counterclaim*, next the Court will review the request for dismissal for failure to state a claim under Rule 12(b)(6).

B.   Failure to State a Claim

A "'federal court[] sitting in diversity,'" as here, must "'apply state substantive law and federal procedural law.'" Suero-Algarín v. CMT Hosp. HIMA San Pablo Caguas, 957 F.3d 30, 39 (1st Cir. 2020) (*quoting* Gasperini v. Ctr. for Humans., Inc., 518 U.S. 415, 427 (1996)). Thus, Puerto Rico law controls the interpretation of tortious interference with contractual relations and defamation claims. *See* Baum-Holland v. Hilton El Con Mgmt., LLC, 964 F.3d 77, 87 (1st Cir. 2020) (applying Puerto Rico substantive law in its diversity case).

1.   Tortious Interference with Contractual Relationships

Puerto Rico's general tort statute, Article 1536 of the 2020 Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, § 10801 ("Article 1536"), grounds this claim. To prevail on a tortious interference

Civil No. 25-1082 (GMM)
Page -16-

suit, Defendants must show: (1) the existence of a contract with which a person interferes; "(2) that the third person has acted tortiously, with knowledge of the contract's existence; (3) damages; and (4) a causal nexus between the damages and the tortious acts of the third person." Ballester Hermanos, Inc. v. Brugal & Cia. C., No. 19-CV-2100-JAG, 2024 WL 4892502, at *2 (D.P.R. May 2, 2024) (citing Gen. Office Prods. Corp. v. A.M. Capen's Sons, 780 F.2d 1077, 1081-82 (1st Cir. 1986)).

The act of tortious interference must have been done with "fault". Puma Energy Caribe, LLC v. Riollano-Caceres, No. 14-CV-1790-JAG, 2017 WL 11607783, at *14 (D.P.R. Dec. 14, 2017) (citing New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002)). "Fault" here is understood to mean that Torres must have "intended to interfere with the contract, knowing that this interference would cause injury to [Defendants]." New Comm Wireless, 287 F.3d at 10 (citing Jusino Figueroa v. Walgreens of San Patricio Inc., 155 P.R. Dec. 560, 2001 WL 1414693, at *5 (P.R. 2001)).

Under Puerto Rico law, it is well settled that a showing that a contract has a fixed term, and is not terminable at will, is essential to a claim of tortious interference. See Dolphin Int'l of P.R. v. Ryder Truck Lines, 127 P.R. Dec. 869, 882-83 (P.R. Jan. 31, 1991) (holding that at-will contracts lacking an expiration date cannot create a tortious interference cause of action). Sister

Civil No. 25-1082 (GMM)
Page -17-

courts in this district have consistently held that a claim for tortious interference cannot be pleaded in the absence of allegations to that effect. *See* Tilsor, S.A., v. Oracle Caribbean, Inc., No. 19-CV-1875-PAD, 2022 WL 20814952, at *11 (D.P.R. Sep. 30, 2022) (*citing* R.R. Isla Verde Hotel Corp. v. Howard Johnson Int'l, Inc., 121 F. App'x 870, 871 (1st Cir. 2005)) ("Existence of a contract for a fixed period of time is indispensable."); Sea World, LLC v. Seafarers, Inc., 191 F. Supp. 3d 167, 173 (D.P.R. 2016) (same); Alpha Biomedical & Diagnostic Corp. v. Philips Med. Sys. Netherland BV, 828 F. Supp. 2d 425, 430 (D.P.R. 2011) (same); Leopoldo Fontanillas, Inc. v. Luis Ayala Colón Sucesores, Inc., 283 F. Supp. 2d 579, 588 (D.P.R. 2003) (same). "If what is affected is a profitable financial relationship in the absence of a contract the [tortious interference] action does not lie." Tilsor, 2022 WL 20814952, at *11.

Defendants fail to adequately plead this first, essential element. For the Court to hold Torres accountable for allegedly interfering with the contracts, as Defendants request, it must first determine whether Defendants have plausibly alleged the existence of contracts between Update Music and the producers that contained fixed terms and were subject to Torres's alleged interference. The contracts with which they allege interference occurred are "[Update Music's] contractual relationships with producers Bless The Producer and Nol." (Docket No. 40 at 13 ¶ 16).

Civil No. 25-1082 (GMM)
Page -18-

However, Defendants merely allege that "[i]n or around the first quarter of 2025, [Torres], who had signed an exclusive artist agreement with [Update Music] in 2018, was aware that, around the same time as his own signing, [that Update Music] had also entered into an exclusive production and producer/artist management agreement with producer 'Bless The Producer.'" (Id. at 11 ¶ 1). These allegations are insufficient because they do not plausibly allege that the contractual relationships at issue were for a fixed term, an indispensable element of a tortious interference claim under Puerto Rico law.

Critically, Defendants do not specify whether the "contractual relationships with producers" had a fixed term, as no period is even mentioned. It is unclear whether the alleged contracts are open-ended or if what was allegedly affected was a profitable financial relationship in lieu of actual contracts as defined by Puerto Rico state law.

Even accepting all the information alleged by Defendants in their *Counterclaim* as true and reviewed in the light most favorable to the non-moving party, as this Court must at this stage of review, Defendants pleadings fail to meet the first element's requirements, as they do not raise the right to relief above the speculative level. Thus, the Court finds that the *Motion to Dismiss* the tortious interference claim should be granted.

Civil No. 25-1082 (GMM)
Page -19-

2.    Breach of Contract

Under Puerto Rico law, a breach of contract claim has three elements: (1) a valid contract, (2) a breach of that contract by one of the parties, and (3) damages consequent to that breach. Yacht Caribe Corp. v. Carver Yacht LLC, 270 F. Supp. 3d 547, 555 (D.P.R. 2017) (citations omitted). A party that fails to comply with a contract's essential obligations is in breach of that contract. See Markel Am. Ins. Co. v. Diaz-Santiago, 674 F.3d 21, 31 (citing P.R. Laws Ann. tit. 31, § 2994).

In this case, the Court's analysis hinges on whether Defendants have pled enough facts in their Counterclaim so that further discovery could plausibly support a breach of contract claim. A review of the pleadings shows that Defendants allege that Torres "materially breached the exclusive artist agreement"[3] that was signed in 2018 "by releasing unauthorized recordings, failing to provide necessary publishing information, ceasing to deliver compositions, recording under pseudonyms for third parties, and aligning himself with direct competitors." (Docket No. 40 at ¶ 25). More specifically, Defendants assert that Defendant Torres breached his agreement with Update Music by: (a) "releasing an EP

---

[3] Plaintiff argues that the reference to an "exclusive artist agreement" is conclusory and not enough to state a plausible claim for breach of contract. However, viewing Defendants' allegations in the light most favorable, Defendants sufficiently show that they are referring to the agreement Torres entered into with Update Music in 2018, the contract that is at the center of both Plaintiff's and Defendants' allegations and claims.

Civil No. 25-1082 (GMM)
Page -20-

without [Martínez's] prior authorization;" (b) "failing to provide all necessary publishing information to [Martínez] to allow for the commercialization of compositions under the PeerMusic agreement"; and (c) "as of on or about February 13, 2025, ceasing to deliver new songs as required under the contract." (Id. at 12 ¶ 12). Also, the *Counterclaim* avers that as a result of these breaches, Defendants suffered financial damage, including lost revenue, lost opportunities, and harm to professional relationships. (Id.).

Upon this, the Court finds that Defendants have pled enough facts to meet the plausibility burden required at this stage and therefore denies Plaintiff's *Motion to Dismiss* the breach of contract claim on these grounds.

3.   Defamation

"In Puerto Rico the tort of defamation can be either intentional or negligent, depending on whether the defamed is a private or public figure, and can come in the form of slander or libel." Segarra Jiménez v. Banco Popular, Inc., 421 F. Supp. 2d 452, 458 (D.P.R. 2006). Slander takes place when the defamation is oral. *See* Ojeda v. El Vocero de P.R., 137 P.R. Dec. 315, 326 (P.R. 1994).

Pursuant to Puerto Rico law, "'a private plaintiff asserting a defamation claim against a private defendant," as is the case here, "'must show that the [opposing party] (1) made a false

Civil No. 25-1082 (GMM)
Page -21-

statement, (2) in a negligent manner, (3) causing actual damage to the plaintiff.'" Rojas-Buscaglia v. Taburno-Vasarhelyi, 199 F. Supp. 3d 520, 536 (D.P.R. 2016), *aff'd sub nom.* Rojas-Buscaglia v. Taburno-Vasarhelyi, 897 F.3d 15 (1st Cir. 2018) (*quoting* Baltodano v. Merck, Sharp & Dohme (I.A.) Corp., 637 F.3d 38, 43 (1st Cir. 2011)). The specific defamatory language used must indeed be false; its veracity is a valid defense. Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 98 (1st Cir. 1996); Villanueva v. Hernández Class, 128 P.R. Dec. 618, 643 (P.R. 1991). Alongside these three elements, when a claim for defamation is brought under Article 1536, a causal relationship between the defamatory statements and the damages suffered must be proven. *See* Rivera v. DHL Glob. Forwarding, 536 F. Supp. 2d 148, 157 (D.P.R. 2008). If on the other hand, a plaintiff is considered a public figure, the defamation would require an even higher showing of actual malice. Pendleton v. City of Haverhill, 156 F.3d 57, 67 (1st Cir. 1998); Lluberes v. Uncommon Prods., LLC, 663 F.3d 6, 13 (1st Cir. 2011).

Claims for defamation must satisfactorily plead these elements. "[C]ountless district courts," including this Court under the laws of Puerto Rico, "have found that the requirements of Rule 8 have not been met in cases where libel and slander claims failed to allege the substance of the statements and/or the time and place in which they were made." Hawkins v. Kiely, 250 F.R.D. 73, 75 (D. Me. 2008) (citing four other district court decisions

Civil No. 25-1082 (GMM)
Page -22-

finding imprecise pleading of what the defamatory statements were led to dismissal); *see also* Ayala-Gerena, 95 F.3d at 98 (dismissing under Puerto Rico defamation laws for the same imprecise pleadings); Feliciano-Monroig v. AT&T Mobility P.R., Inc., No. 16-CV-2810-JAG, 2019 WL 1486868, at *10 (D.P.R. Mar. 31, 2019) (same).

Key to this analysis, therefore, are the actual, specific "false statements" allegedly communicated by Torres. Rojas-Buscaglia, 199 F. Supp. 3d at 536. The *Counterclaim* supplies three potential leads for what specific defamatory language Torres may have said.

First, Defendants allege that "[d]uring the first quarter of 2025, [Torres] contacted producers under contract with [Martínez] and made statements of a defamatory nature regarding [Update Music] and [Martínez]." (Docket No. 40 at ¶ 3). Second, Defendants posit that "[t]hese defamatory statements included, but were not limited to, false assertions that [Martínez] was not doing anything for the artists he signed and that he failed to promote or advance their careers." (Id. at ¶ 4). Third, Defendants assert that "[Torres] made such statements at multiple recording studios and in conversations with industry professionals, including producers Bless The Producer and Nol, with the intent to damage [Martínez's] reputation and business relationships." (Id. at ¶ 5). Defendants added that Torres "began repeating defamatory statements about [Martínez] to third parties in the Puerto Rico music industry,

Civil No. 25-1082 (GMM)
Page -23-

falsely claiming that [Martínez] failed to provide services to his signed artists and that his company was not trustworthy." (Id. at ¶ 10).

Taken as true, the facts plausibly plead false statements and damages—the first and third elements for a defamation claim. Notably, however, as to the second element, the *Counterclaim* contains conclusory allegations about "defamatory statements" and "actual malice", but it contains no factual assertions that in any way lend plausibility to these conclusions. Although the *Counterclaim* alleges that Torres intended to damage Martínez's reputation, it does not include factual allegations permitting a reasonable inference that Torres acted negligently, or with actual malice, as to the truth or falsity of the statements allegedly made.[4] Defendants simply make bald, general and conclusory assertions that merely provide a formulaic recitation of the elements of the cause of action. As the First Circuit has stated in similar cases, "[i]n determining whether allegations cross the plausibility threshold, an inquiring court need not give weight to bare conclusions, unembellished by pertinent facts." Schatz v. Republican State Leadership Comm., 669 F.3d at 56.

---

[4]It is not clear from the pleadings whether Torres is considered a private person or a public figure. Regardless, Defendants' *Counterclaim* does not meet the lower standard of negligence, much less their pleadings cannot plausibly support a showing of actual malice.

Civil No. 25-1082 (GMM)
Page -24-

Thus, even making all reasonable inferences in Defendants' favor and disregarding the conclusory statements in the *Counterclaim*, the Court finds they have not sufficiently alleged the elements of a defamation claim against Torres. Therefore, the *Counterclaim* fails to state a plausible claim for defamation and it must be dismissed.

4.    Unjust Enrichment

Lastly, Plaintiff seeks to dismiss the *Counterclaim*'s unjust enrichment claim, given that such claim would not apply as a matter of law if a contract governs the dispute at issue. The Court notes that this claim is pled in the alternative by Defendants and would be applicable only if the Court finds no enforceable contract governs. Accordingly, the Court declines to dismiss the unjust enrichment claim at this stage because it has been pled in the alternative.

**IV.    CONCLUSION**

For the reasons explained above, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiff's *Motion to Dismiss*.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, on May 22, 2026.

s/Gina R. Méndez-Miró
GINA R. MÉNDEZ-MIRÓ
UNITED STATES DISTRICT JUDGE